## Affidavit in Support of Civil Forfeiture Complaint

I, Christopher M. Ranney, after being duly sworn, depose and state as follows:

1.      I have been employed by the Federal Bureau of Investigation (FBI) as a Special Agent
since August 2003. I have been assigned to the Dallas Division since 2006. My duties
include investigating alleged violations of the laws of the United States, to include Title
18, United States Code § 1343 (wire fraud). My experience in the FBI includes
approximately twelve (12) years of investigating white-collar matters, to include health
care fraud, oil and gas, and other monetary frauds.

2.      The statements set forth in this affidavit are true and correct to the best of my knowledge.
The facts in this affidavit come from information obtained from records, witnesses, and
other law enforcement officers, agents, or analysts. This affidavit is only intended to
support a civil forfeiture complaint and does not set forth all of my knowledge about this
investigation.

3.      This affidavit is in support of civil forfeiture of residential property located at 217 County
Road 403, McKinney, Texas 75069-1097.  This residential property address is also
known as 217 Dowdy Road, McKinney, Texas 75069-1097.   According to a land survey,
the property was further described as: Abs A0517 R H Locke Survey, Sheet 2, Tract 30,
5.0435 Acres.

4.      This affidavit is in support of civil forfeiture of 38.737 acres of property located at 399
County Road 403, McKinney, Texas 75069-1097.  This property address is also known
as 399 Dowdy Road, McKinney, Texas 75069-1097.  According to a land survey, the
property was further described as:

"LEGAL DESCRIPTION from new survey by William Davis Finney dated 6/14/15;
BEING A TRACT ORPARCEL OF LAND SITUATED IN THE R.H. LOCKE SURVEY,
ABSTRACT NO. 517, COLLIN COUNTY, TEXAS AND BEING TRACT I AND TRACT II AS
CONVEYED TO NORRIS FAMILY PARTNER, LTD. IN VOLUME 5806, PAGE 4189 OF THE
REAL PROPERTY RECORDS OF COLLINCOUNTY, TEXAS (R.P.R.C.C.T.) AND BEING
MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS; BEGINNING
AT MAGNAILSET FOR THE NORTHWEST CORNER OF TRACT II OF NORRIS TRACT AND
BEING AT THE NORTHEAST CORNER OF A TRACT OF LAND AS CONVEYED TO WILLIAM
G. RITTENHOUSE IN VOLUME 279, PAGE 691 OF THE R.P.R.C.C.T.  AND BEING IN THE
CENTER LINE OF COUNTYROAD 403 (A.K.A. DOWDY ROAD A 40' INGRESS, EGRESS
AND REGRESS EASEMENT TOCOLLIN COUNTY IN INSTRUMENT NO.
201301110000050910 AND NO. 20130116000070350 OFFICIAL PUBLIC RECORDS COLLIN
COUNTY, TEXAS) AND LYING IN THE SOUTH LINE OF ATRACT OF LAND AS CONVEYED
TO ROBERT JR. AND KATHRYN WEBB IN CLERK FILE NO.20070827001181400
R.P.R.C.C.T.); THENCE NORTH 88 DEGREES 59 MINUTES 40 SECONDS EAST, WITH THE
CENTER LINE OF SAID ROAD AND WITH THE NORTH LINE OF SAID TRACT II OF NORRIS
TRACT AND THE SOUTH LINE OF WEBB TRACT AND A TRACT OF LAND AS CONVEYED
TO GREER MOZELLE LIVING TRUST A DISTANCEOF 286.29 FEET TO A MAGNAIL SET
FOR A ANGLE POINT IN ROAD; THENCE NORTH 89DEGREES 44 MINUTES 38 SECONDS
EAST, WITH THE CENTER LINE OF SAID ROAD AND THE NORTH LINE OF TRACT II OF
NORRIS TRACT AND THE SOUTH LINE OF GREER TRACT A DISTANCE OF 46.65 FEET TO
A 1/2" IRON ROD FOUND FOR CORNER SAID CORNER BEING AT THE NORTHEAST
CORNER OF TRACT II AND AT THE NORTHWEST CORNER OF TRACT I OF NORRIS
TRACT; THENCE NORTH 89 DEGREES 51 MINUTES 51 SECONDS EAST, WITH THE
CENTER LINE OF SAID ROAD AND THE NORTH LINE OF TRACT I OF NORRIS TRACT AND
THE SOUTH LINE OF GREER TRACT A DISTANCE OF 355.68 FEET TO A MAGNAIL SET

FOR THE NORTHEAST CORNER OF SAID TRACTI AND BEING AT THE NORTHWEST

CORNER OF A TRACT OF LAND AS CONVEYED TO JUDY TUNEY AND SHERMAN L.

POSTLE AS RECORDED IN CLERK FILE NO. 1334030 R.P.R.C.C.T; THENCE SOUTH 05

DEGREES 30 MINUTES 02 SECONDS WEST, WITH THE WEST LINE OF SAID POSTLE

TRACT AND THE EAST LINE OF TRACT I OF NORRIS TRACT AND THE WEST LINE OF A

TRACT OF LAND AS CONVEYED TO WILLIAM AND ROSEMARY CALK AS RECORDED IN

CLERK FILE NO.02-0037951 OF THE R.P.R.C.C.T.  A DISTANCE OF 699.42 FEET TO A 60D

NAIL FOUND FOR CORNER; THENCE SOUTH 20 DEGREES 56 MINUTES 33 SECONDS

EAST, WITH THE NORTHEASTERLY LINE OF TRACT I OF NORRIS TRACT AND THE

SOUTHWESTERLY LINE OF CALK TRACT AND NEAR A WIRE FENCE A DISTANCE OF

1216.59 FEET TO A 3/4" IRON PIPE FOUND FOR A ANGLE CORNER AND BEING IN A

WIRE FENCE INTERSECTION OF SAID TRACT I OF NORRIS TRACT AND BEING AT THE

SOUTH CORNER OF CALK TRACT AND AT THE SOUTHWEST CORNER OF LOT 1, BLOCK

A OF MITCHELL ADDITION IN CABINET G, SLIDE 26 OF THE PLAT RECORDS OF COLLIN

COUNTY,TEXAS, SAID CORNER BEING AT THE NORTHWEST CORNER OF A TRACT OF

LAND AS CONVEYED TO GREGORY C. AND GENA S. GARRISON AS RECORDED IN

CLERK FILE NO. 01-0016714 OF THE R.P.R.C.C.T.; THENCE SOUTH 00 DEGREES 46

MINUTES 27 SECONDS EAST, WITH THE EAST LINE OF SAID TRACT I OF NORRIS TRACT

AND THE WEST LINE OF GARRISON TRACT A DISTANCE OF 270.23 FEET TO A1/2" IRON

ROD FOUND AT A WIRE FENCE CORNER INTERSECTION SAID CORNER BEING AT THE

SOUTHEAST CORNER OF SAID NORRIS TRACT AND BEING AT THE NORTHEAST

CORNER OF A TRACT OF LAND AS CONVEYED TO TRACY AND DEBRA CALVERLEY IN

CLERK FILE NO.20130812001139010 OF THE R.P.R.C.C.T; THENCE NORTH 89 DEGREES

42 MINUTES 33 SECONDS WEST, WITH THE SOUTH LINE OF TRACT I OF NORRIS TRACT

AND THE NORTH LINE OF SAID CALVERLEY TRACT AND NEAR A WIRE FENCE

PASSINGA 1/2" IRON ROD FOUND AT A DISTANCE OF 184.48 FEET CONTINUING IN ALL

A TOTAL DISTANCE OF 223.90 FEET TO A SMALL NAIL FOUND FOR A ANGLE CORNER;

THENCE NORTH 89 DEGREES 43 MINUTES 20 SECONDS WEST, WITH THE SOUTH LINE OF TRACT I AND THE NORTH LINE OF CALVERLEY TRACT AND NEAR WIRE FENCE PASSING AT A DISTANCE OF 400.00 FEET THE NORTHWEST CORNER OF SAID CALVERLEY TRACT AND BEING AT THE NORTHEAST CORNER OF A TRACT OF LAND AS CONVEYED TO TODD S. VILES IN VOLUME 5771, PAGE 3923 OF THE R.P.R.C.C.T. CONTINUING WITH THE SAID SOUTH LINE OF TRACT I AND TRACT II OF NORRIS TRACT AND THE NORTH LINE OF SAID VILES TRACT A TOTAL DISTANCE OF 603.12 FEET TO A 1/2" IRON ROD WITH RED CAP FOUND FOR A ANGLE CORNER; THENCE NORTH 89 DEGREES 05 MINUTES 34 SECONDS WEST, WITH THE SOUTH LINE OF TRACT II OF NORRIS TRACT AND THE NORTH LINE OF SAID VILES TRACT A DISTANCE OF 229.65 FEET TO A 1/2" IRON ROD FOUND AT A FENCE CORNER INTERSECTION SAID CORNER BEING AT THE SOUTHWEST CORNER OF TRACT II OF NORRIS TRACT AND AT THE SOUTHEAST CORNER OF SAID RITTENHOUSE TRACT; THENCE NORTH 00 DEGREES 05 MINUTES 36 SECONDS WEST, WITH THE WEST LINE OF TRACT II OF NORRIS TRACT AND THE EAST LINE OF SAID RITTENHOUSE TRACT AND NEAR A WIRE FENCE A DISTANCE OF 2088.86 FEET TO THE POINT OF BEGINNING CONTAINING 1,687,391 SQUARE FEET OR 38.737 ACRES OF LAND."

<u>Legal authority for forfeiture</u>

5.      Based on my experience and the information contained in the subsequent paragraphs, I have probable cause to believe the property described in paragraphs three (3) and four (4) are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) which states, in part, that any property, real or personal, which constitutes or is derived from proceeds traceable to any specified unlawful activity listed under 18 U.S.C. § 1956(c)(7) is subject to forfeiture.  According to 18 U.S.C. § 1956(c)(7)(F), one such specified unlawful activity is any act or activity constituting a wire fraud offense.

6.      18 U.S.C. § 1343 states whoever, having devised or intending to devise any scheme or

artifice to defraud, or for obtaining money or property by means of false or fraudulent

pretenses, representations, or promises, transmits or causes to be transmitted by means of

wire, radio, or television communication in interstate or foreign commerce, any writings,

signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice,

shall be fined under this title or imprisoned not more than 20 years, or both.

Background

7.      On or about March 31, 2010, Sherman L. Postle, also known as Scott Postle, and his

spouse, Judy T. Postle, who reside in Collin County, Texas, incorporated Our Medical

Home Team (OMHT).  On or about January 27, 2011, the Postles incorporated America's

Medical Home Team (AMHT).  AMHT did business as Medical Home Team (MHT).

8.      According to a letter dated January 13, 2016, signed by Scott Postle, "…MHT is

primarily engaged in the provision of management and certain other support services to

'affiliated medical home practices' with whom MHT has entered into a management

services agreement and one or more license agreements.   A 'medical home practice' is

an entity in which MHT has no ownership interest that provides either primary care

services or transitional care services to, or for the benefit of, high risk patients enrolled in

Part B of the federal Medicare program through the services of one or more medical

home care teams.  A 'medical home care team' is a team of individuals, including a

licensed nurse practitioner or physician assistant and either a specially trained medical

assistant or one or more licensed vocational nurses or licensed practical nurses, guided by

a physician team leader.  The 'physician team leader' is often an owner of the medical

home practice, either directly or indirectly through his or her clinical practice entity.

MHT is also a licensee of certain computer software and other intellectual property owned by others (including Our Medical Home Team, LLC.) that is used by each medical home practice in the furnishing of medical home teams services to its patients.  MHT is not itself a provider of healthcare services (whether home health services, nursing services or any other type of healthcare service), rather, it manages the operations of its affiliated medical home practices and their medical home care teams…."

9.   Investigation revealed that physicians were told by MHT representatives that a MHT license would include an advanced practitioner (Nurse Practitioner or Physician Assistant), a population of approximately 100-150 patients, proprietary electronic medical record software, and an electronic tablet to review patients' medical charts. MHT sold their license to physicians throughout the United States, to include, but not limited to Texas, Louisiana, and Michigan.  Physicians were able to purchase a MHT license for approximately $75,000.00 each.  MHT typically sold physicians multiple licenses.

10.  According to witnesses, in return for the $75,000 license, MHT was responsible for paying the advanced practitioner's salary, marketing the physician's house calls practice, recruiting the patient base, providing the electronic tablet, submitting claims for reimbursement to the Centers for Medicare and Medicaid Services (CMS), managing the physician's house calls bank account(s), making payments on associated loans obtained by the physician to purchase the MHT license(s), and providing access to EMR software. Witnesses stated that physicians who purchased a MHT license were responsible for reviewing patient chart notes documented by the advanced practitioner.

11.  Physicians who purchased MHT license(s) typically obtained financing from one of three private equity firms partnered with MHT.  The purchasing physician obtained the

financing and was personally liable for the terms of the contract.  According to witness AM, MHT sales representatives "sold" loan reimbursement as one of the benefits provided by MHT.  Sales representatives told physicians there was "no risk to you, we will pay" (loans).

12.     After a physician signed a contract with MHT and obtained financing from one of the three private equity firms, MHT established a Limited Liability Corporation (LLC) on behalf of the physician.

<u>Investigation</u>

13.     AMHT held business checking and savings accounts at JPMorgan Chase Bank, N.A. (JPMC).  Likewise, OMHT held business checking and savings accounts at JPMC.

14.     Beginning on or about August 23, 2013, AMHT's JPMC business checking account ending in 5944, began to receive book transfer deposits from Ascentium Capital, LLC. Deposits ranged from tens of thousands of dollars, to hundreds of thousands of dollars, to millions of dollars. Many of the deposits included information as to which physician LLC the deposit represented.  For example, on January 15, 2014, a deposit was made into the AMHT account ending in 5944. The deposit included a memo stating "West State MHT, LLC Inv # 01072014."  From August 23, 2013 to December 31, 2015, there were at least 84 book transfer deposits from Ascentium Capital, LLC deposited into the AMHT account ending in 5944, totaling $16,689,937.50.

15.     Beginning on or about February 6, 2013, and continuing until approximately December 1, 2016, there were at least 83 online transfer of funds transferred from the AMHT account ending in 5944, to the OMHT account ending in 4194.  The 83 online transfer transactions noted above totaled approximately $4,467,432.48.

16.   Beginning on or about March 6, 2013, and continuing until approximately October 17, 2016, there were at least 24 online transfer of funds transferred from the OMHT account ending in 4194, to the AMHT account ending in 5944.  The 24 online transfer transactions noted above totaled approximately $1,162,524.45.

17.   As a result of the online transfer transactions noted in paragraphs 14 and 15 above, of the approximately $4,467,432.48 transferred from AMHT account ending in 5944, a total of $3,304,908.03 was not returned to AMHT account 5944 or used for AMHT operations.

18.   It should be noted that Sherman and Judy Postle each received payroll from AMHT that was separate and distinct from the funds transferred from AMHT account ending in 5944 to the OMHT account ending in 4194 (as described in paragraph 14).  The Postles each received electronic deposits and hard checks for their payroll.  Your Affiant identified only one additional source of income for the Postles.  The Postles received deposits made by the Social Security Administration into their personal bank account.

19.   Instead of making payments on physician's loans and utilizing funds for business related expenses, Sherman and Judy Postle utilized the funds within the OMHT account ending in 4194 as their personal funds.

20.   From May 13, 2013, through October 28, 2016, there were at least 35 electronic fund transfers from the OMHT account ending in 4194 to the Postles' personal bank account ending in 7431. The 35 electronic fund transfers totaled $274,779.00.

21.   The Postles used funds transferred from AMHT account ending in 5944 to the OMHT account ending in 4194 to pay for dental services. From May 1, 2013, through February 2, 2016, there were seven transactions (card purchases and checks) payable to dental service providers. The seven transactions totaled $25,215.80.  One specific transaction

that occurred on February 19, 2015, was a check payable to McKinney Dentist in the amount of $8,767.23.  "Dental work – Scott" was written within the memo section of the check.

22. The Postles used funds transferred from AMHT account ending in 5944 to the OMHT account ending in 4194 to pay for personal taxes.  On October 15, 2013, a check payable to the IRS in the mount of $10,000.00 was entered into the OMHT account ending in 4194. "Payment for 2012 taxes for Sherman and Judy Postle" was written within the memo section of the check.  On February 7, 2014, a check payable to the IRS in the amount of $22,850.00 was entered into the OMHT account ending in 4194. "XXX-XX-8338 (1040V)" was written within the memo section of the check.  XXX-XX-8338 is the Social Security Account Number of Sherman Postle.

23. The Postles used funds transferred from AMHT account ending in 5944 to the OMHT account ending in 4194 to pay for a cruise vacation.  On October 5, 2015, nine card purchase transactions, for purchases made on the Navigator of the Seas, were posted in the OMHT account ending in 4194.  An open records search of "Navigator of the Seas" revealed it is a voyager class cruise ship operated by Royal Caribbean.  The nine card purchase transactions totaled $35,768.88.

24. On October 1, 2015, presumably during the Postle's cruise aboard the Navigator of the Seas, a card purchase transaction at Diamonds International Cozumel posted in the OMHT account ending in 4194.  The card purchase transaction totaled $18,800.00.

25. As detailed below, the Postles used funds that were transferred from AMHT account ending in 5944, to the OMHT account ending in 4194, to purchase of approximately 38.737 acres of land, described above in paragraph four.

26.    On May 20, 2015, an electronic funds transfer occurred in the amount of $90,000.00 from the AMHT account ending in 5944, to the OMHT account ending in 4194.

27.    On May 20, 2015, a withdrawal in the amount of $89,500.00 was made from the OMHT account ending in 4194.  Noted on the withdrawal slip was "Hexter-Fair."  Investigation revealed that the Postles utilized Hexter-Fair/First American title Company to process their land purchase transaction.

28.    A copy of a Chase cashier's check dated May 20, 2015, in the amount of $89,500.00 was obtained from First American Title and Insurance Company (FATICO).  The Chase cashier's check was payable to Hexter Fair and was remitted by Our Medical Home Team, LLC.

29.    On July 22, 2015, $525,000.00 was electronically transferred from the AMHT account ending in 5944 to the OMHT account ending in 4194.

30.    On July 24, 2015, $150,000.00 was electronically transferred from the AMHT account ending in 5944 to the OMHT account ending in 4194.

31.    On July 31, 2015, $150,000.00 was electronically transferred from the AMHT account ending in 5944 to the OMHT account ending in 4194.

32.    The amount transferred from AMHT account ending in 5944 to the OMHT account ending in 4194, noted above in paragraphs 28, 29, and 30, totaled $825,000.00.

33.    On July 31, 2015, a wire transfer in the amount of $805,851.08 was sent from the OMHT account ending in 4194 to Hexter-Fair/First American Title Company.  Noted within the transaction was "Purchase of property address 399 Dowdy Road, McKinney, TX 75069."

34.    An Incoming Wire Details Report dated July 31, 2015, obtained from FATICO, revealed that the payment noted in paragraph 32, in the amount of $805,851.08, was received on

July 31, 2015, from JPMChase account XXXXX4194, Our Medical Home Team LLC

Operating 1515 Heritage Dr., STE 110, McKinney, TX 75069.

35.     A Disbursement Summary Report obtained from FATICO revealed that the "buyer" of

the 38.737 acres of land as described in paragraph four above was "Our Medical Home

Team, LLC."

36.     According to the Collin County, Texas Clerk's Office website,

http://countyclerkrecords.co.collin.tx.us/webinquiry/, on August 7, 2015, document

20150807000991450 was recorded.  Document number 20150807000991450 was

identified as a Special Warranty Deed that revealed the Grantor, Norris Family Partners,

Ltd., a Texas limited partnership, transferred approximately 38.737 acres of land to the

Grantee, Our Medical Home Team, LLC., whose address was 1515 heritage Drive, Suite

110, McKinney, Texas 75069, with an effective date of July 31, 2015.

37.     According to the Collin County, Texas Clerk's Office website,

http://countyclerkrecords.co.collin.tx.us/webinquiry/, on November 9, 2016, document

20161109001528620 was recorded.  Document number 20161109001528620 was

identified as a General Warranty Deed that revealed the Grantor, identified as Our

Medical Home Team, LLC., transferred the deed for the 38.737 acres of land described

above in paragraph four to the Grantees, identified as Sherman L. Postle and Judy Postle.

38.     According to the Collin County Appraisal District's website, https://www.collincad.org/,

Sherman and Judy Postle are the owners of two properties within Collin County, Texas.

One being the 38.737 acres of land with an address of 399 Dowdy Road, McKinney,

Texas 75069 (Collin County Appraisal District property ID 2720496) noted above in

paragraph four.  The other being a residence located at 217 Dowdy Road, McKinney, Texas 75069 (Collin County Appraisal District property ID 1082919).

39.     The Postles used funds that were transferred from AMHT account ending in 5944, to the OMHT account ending in 4194, to payoff their residence located at 217 Dowdy Road, McKinney, TX 75069.

40.     According to the Collin County, Texas, Clerk's Office website, http://countyclerkrecords.co.collin.tx.us/webinquiry/, on August 19, 2015, document 20150819001045750 was recorded.  Document number 20150819001045750 was identified as a Release of Lien that revealed loan number 1881457779, was serviced by JPMorgan Chase Bank, N.A., for property address 217 County Road 403, McKinney, TX 75069-1097.

41.     Loan documents obtained from JPMorgan Chase Bank, N.A. revealed that the loan application for loan number 1881457779, in the name of Judy T. Postle, for the property located at 217 County Road 403, McKinney, TX 75069-0000, was signed by Judy T. Postle on February 28, 2008.

42.     A Chase Detailed Transaction History report obtained from JPMorgan Chase Bank, N.A. revealed that on August 3, 2015, the following four transactions were made to loan 1881457779 totaling $368,200.44: Chase Detailed Transaction History reference number 273 was transacted on August 3, 2015, in the amount of $99,999.99;  Chase Detailed Transaction History reference number 274 was transacted on August 3, 2015, in the amount of $99,999.99;  Chase Detailed Transaction History reference number 275 was transacted on August 3, 2015, in the amount of $99,999.99;  and Chase Detailed

Transaction History reference number 276 was transacted on August 3, 2015, in the amount of $68,200.47.

43. Transaction number 276 of the Chase Detailed Transaction History report revealed that the principal balance had been paid in full.

44. On August 1, 2015, two days prior to the payoff of the Postle's residence located at 217 Dowdy Road, McKinney, TX 75069, a withdrawal in the amount of $368,200.44 was made from the OMHT bank account ending in 4194.

45. Beginning on or about April 10, 2015 and continuing through at least December 27, 2016, checks drafted from the OMHT bank account ending in 4194 were written to the following entities: Accent Remodeling, Accent Country Homes, Keane Contractors, Keane Landscaping, and Rockwall Contractors.  A total of 54 checks written to the aforementioned entities were identified, totaling $994,109.62.

46. Twenty-two (22) of the 54 checks described in paragraph 45 were written to Accent Remodeling, totaling $546,425.00.  Thirteen (13) of the 22 checks had content written within the memo section of the checks.  Memos written on the checks included: "217 Home Remodel," "217 Remodel," "217 Dowdy Remodel," and "217 Dowdy Rd."

47. Two of the 54 checks described in paragraph 45 were written to Accent Country Homes, totaling $54,000.00.  One of the two checks had content written within the memo section of the check.  The memo written on the check stated: "New Construction."

48. One of the 54 checks described in paragraph 45 was written to Keane Contractors, totaling $55,000.  The check did not have any content within the memo section.

49. Seven of the 54 checks described in paragraph 45 were written to Keane Landscaping, Inc., totaling $97,530.43.  Four of the seven checks had content written within the memo

section of the checks.  Memos written on the checks included: "1st down payment for phase I," "Sprinklers/Dog Run," "pymt 3 of 6," and "Inv # 11306."

50.    Twenty-two (22) of the 54 checks described in paragraph 45 were written to Rockwall Contractors, totaling $241,154.19.  Twelve (12) of the 22 checks had content written within the memo section of the checks.  Memos written on the checks included: "Deposit on pool repair," "Pool equipment," "Inv. #2270," "Inv. #2256, 2258, 2271," "concrete driveway," "Inv. #1175," "Inv. #2320," "Inv. #2327," "Construction," "Sprinklers and fence," "Sprinklers / Dog Run," and "Inv. #2440."

51.    Beginning on or about July 4, 2015, and continuing through at least June 6, 2016, checks drafted from the OMHT bank account ending in 4194 were written to the following entities: Freedom Powersports and Landmark Equipment.  A total of five checks written to the aforementioned entities were identified, totaling $80,796.68.

52.    One of the five checks described in paragraph 51 was written to Freedom Powersports, totaling $15,524.19.  The check had content written within the memo section of the check.  The memo written on the check stated: "Polaris Ranger 570E."

53.    Four of the five checks described in paragraph 51 were written to Landmark Equipment, totaling $65,272.49.  Four of the checks had content written within the memo section of the checks.  The memos written on the checks stated: "Tractor and implements," "Implements," "Ranch," and "Ranch Equip."

54.    Beginning on or about August 10, 2015 and continuing through at least August 31, 2015, checks and card purchases drafted from the OMHT bank account ending in 4194 were payable to the following entity: The Arrangement.  A total of two checks and two card purchases made to the aforementioned entity were identified, totaling $100,201.06.

<u>FBI Interviews</u>

55.     I interviewed A.M.  A.M. worked at AMHT from April 2013 through January 2017 in the

Finance department.  A.M. told me that Sherman and Judy Postle used OMHT and the

OMHT bank accounts as a way to "siphon money out of AMHT."  A.M. knew the

Postle's used funds from an OMHT bank account to purchase the 38.737 acres of land

next to the Postle's residence.  A.M. was instructed by Sherman Postle to transfer

$1,000,000.00 from AMHT bank account ending in 5944 to the OMHT bank account

ending in 4194.  A.M. was further instructed by Sherman Postle to make a wire transfer

from the OMHT bank account ending in 4194, payable to Hexter-Fair, for the purchase of

the 38.737 acres of land.  A.M. was unable to complete the wire transfer as instructed

because the funds to be wire transferred exceeded JPMC's maximum online wire transfer

limit.  A.M. stated that MHT stopped paying several employee's salaries beginning in

approximately late 2016. A.M. quit after not being paid his/her salary for the month of

January 2017.

56.     P.S. was interviewed by another FBI Agent familiar with this investigation. P.S. worked

for AMHT in the billing department.  P.S. reported to the interviewing Agent that P.S.

"…did not have any proof that Postle (Sherman) transferred money from the MHT

accounts to other accounts or his personal accounts.  However, P.S. was 'fairly certain'

Postle (Sherman) did.  P.S. believed Postle (Sherman) used company funds for personal

gains.  Postle purchased a house, a Porsche, went on vacations, and had plastic surgery."

57.     I interviewed T.N.  T.N. and his/her partners are physicians with a medical practice in

Texas.  In May 2015, after receiving information from MHT sales representative Brad

Leire and MHT CEO Scott Postle, T.N. and his/her partners agreed to fund one MHT

license for $75,000.00.  T.N. advised that he/she was told by MHT sales representative Brad Leire that the physicians "were not financially obligated" for the monies obtained to fund the MHT license.  T.N. was told that after the first license reached "the maximum number of patients," additional MHT license(s) could be activated, up to four licenses. Each additional license would be funded at a rate of $75,000.00.  In approximately October or November 2015, T.N. and his/her partners began to receive collection notices for overdue loan payments. T.N. and his/her partners learned from the collection notices that four MHT licenses had been funded in their names.  T.N. and his/her partners did not authorize MHT to obtain funding for four licenses. Nor did MHT inform T.N. that MHT would obtain funding for three additional licenses.  MHT executives did not advise T.N. how MHT would utilize the funds that were guaranteed by the physicians.  MHT did not tell T.N. that any portion of the funds guaranteed by T.N. and other physicians would be used by Scott Postle for personal gain.  MHT did not seek T.N.'s input regarding utilization of MHT funds to pay for cruise vacations for MHT executives (Scott and Judy Postle).

58.    Through the process of conducting interviews, I obtained MHT related documents from T.N.'s office. One such document was an application for financing for Ascentium Capital (AC). The document appeared to have been filled out by office manager K.L. The document contained a handwritten "X4," representing a multiple of four, beneath the section titled Asset to be Financed. "X4" was handwritten under a check marked selection that read: Medical Home Team & ACO License Agreement with Software & Computer Tablets.  I interviewed K.L. who confirmed that he/she filled out the application for financing. When asked about the "X4" notation on the application, K.L.

advised that he/she was instructed to write "X4" on the application by a MHT employee. K.L. could not recall the name of the MHT employee who instructed her to write "X4" on the application.

59.   I have has interviewed additional physicians in Texas who stated they understood their agreement with MHT to be the funding of one MHT license.  Should the first license perform to the physicians' financial expectations, the physicians understood they had an option to fund a second, third, and/or fourth MHT license.  Similar to T.N. and his/her partners, the other physicians also received collection notices indicating they were personally liable for four licenses.  The other physicians also stated they were not advised by any MHT representative or executive regarding the use of MHT funds for the Postle's (Sherman and Judy) personal gain. None of the other physicians interviewed had any knowledge that the Postle's (Sherman and Judy) utilized MHT funds to take MHT executives (Sherman and Judy Postle) on lavish cruise vacations.  T.N. and the other physicians stated that several advanced practitioners (Nurse Practitioners and/or Physician Assistants) quit working for MHT after they had not been paid their salaries.

Conclusion

60.   Based on information obtained through the process of this investigation, I have probable cause to believe that Sherman and Judy Postle, intentionally misused MHT funds that were intended for legitimate business purposes, to include, but not be limited to the repayment of loans obtained in the names of physicians and the payment of MHT employee's salaries.

61.   Based on the information set out in the preceding paragraphs, I have probable cause to believe that the 38.737 acres of land at 399 Dowdy Road, McKinney, TX 75069 and the

residence located at 219 Dowdy Road, McKinney, TX 75069 are each property subject to forfeiture because each constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343 (Wire Fraud).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury the foregoing affidavit is true and correct.

Christopher M. Ranney
Special Agent
Federal Bureau of Investigation

Dated: _11/14/2018_